UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                Plaintiff,               Case No. 25-cr-20621
   v.

Jermaine Ray Cook,               Hon. Denise Page Hood

                Defendant.

_____/

## Jermaine Ray Cook's Corrected Sentencing Memorandum

Jermaine Ray Cook understands fully that he did wrong. That possessing ammunition and a gun that night as a prohibited person because of a "lack of patience" destroyed his path.

> I know that the moment that I allowed my decisions to become criminal was the same moment I lost sight of all the personal things, people, and relationships I jeopardized. Just to have reality reflect upon me like a mirror, exposing where I went wrong. But the positive thing about this situation is that mistakes are made to learn from in order to grow into knowledge of understanding.

Ex. B – Letter from Jermaine Ray Cook, at 01.

During the pendency of sentencing, Jermaine took steps to clear a detainer for not having a driver's license in 2019, which resulted in a higher criminal history category, and thus a change from the advisory range of 27 to 33 months to the higher 30 to 37 months in this case. Counsel respectfully

1

requests that this Court impose a sentence below the advisory range of no more than sixteen months pursuant to 18 U.S.C. § 3553. Such sentence is just and fulfills the "overarching" command of section 3553: that a sentence be "sufficient, but not greater than necessary" to fulfill the purposes of sentencing, that included retribution, deterrence, incapacitation, and rehabilitation. *Tapia v. United States*, 564 U.S. 319, 325 (2011).

## I.      Jermaine Ray Cook's Background



Jermaine's birth card and photo

Jermaine Ray Cook is the product of a relationship between Michael Jackson and Ethel Cook. That relationship did not last long.

Jermaine grew up in Detroit in an unstable environment. There were five children to feed in the Cook household. The oldest and youngest separated by approximately eight years. Ethel in many respects was overwhelmed. She was a single mother for large periods. Jermaine used hand-me-downs from his older brother or used clothing his mother found. It

was not "nice" or what other children wore in Detroit Public Schools. It was all that they had.

During Jermaine's childhood years they lived in the Buffalo projects/housing complex in Detroit. She worked extensively throughout Jermaine's childhood, but it was not enough.

Ethel struggled mightily even with low pay and government assistance. It was through that government lifeline that the family had enough food and a roof over them; however, their housing was far from suitable. Cockroaches, vermin, and constant structural failures in the apartment and housing project made that environment dirty and unhealthy.



Jermaine

They were a proud family and put each other's well-being first. Some of the care they showed each other was founded on not having their biological father's around. In fact, Jermaine met Michael for the first time at age

3

seventeen. By then, it was known that Michael suffered from a severe drug addiction for years that precipitated his abandonment of Jermaine and Ethel. Jermaine now speaks to his father who still suffers from drug addictions and other health issues. His father is transient in Detroit, and his phone number changes often. The place to find him is medical facility he is at when receiving medical care and needs stability.

Michael Cook, Jermaine's older brother by two years, described that their mother struggled throughout. He could not take it and at age fourteen he left the home and never returned. His memories are of the projects they lived on for about seven or eight years and then the family losing housing after that. The fragile life her mother tried to maintain with food stamps and a low paying job. He left for a friend's home while he saw Jermaine take refuge with neighborhood kids and adults. While he has "feelings" about leaving home, it was the choice he needed to make regardless of the effect on the rest of the siblings. He did not see his family often after that and is angry by their father's abandonment. Jermaine may want contact with their biological father; Michael wants nothing of the sort.

In January 2009, during Jermaine's period of parole supervision for his only felony conviction on his record, Ethel died of heart complications. She was 50 years old. Her death deeply affected Jermaine. "He was extremely

close to her. Losing her created a void in his life that I believe led to misplaced anger and emotional pain that he struggled to process." Ex. A – Letter from Ashley Ballestero, at 04.

In terms of schooling, Jermaine's formal education is limited. He completed the ninth grade at Central High School before having his education cut short. He made unsuccessful attempts at obtaining a GED after high school both at the Michigan Department of Corrections and community. Math concepts are particularly challenging. He needs help with mathematical concepts to have a fighting chance at obtaining his GED.

Jermaine feels best when working. For several years he worked at multiple locations with the help of others. His 2004 conviction remains a bar for employment opportunities. He writes about the summer of 2024:

> It was a difficult time for me because I couldn't get a job. I tried many times. I didn't have patience with all the job applications I filled out on Indeed and other job sites. The difficulty was my previous conviction from 2004 that scares employers. Employers could not look beyond the conviction from over 20 years ago. I became desperate and a hopeless provider for my children and myself.

Ex. B – Letter from Jermaine Ray Cook, at 01.

After almost two years of not having consistent work, he obtained work at Arkin's BBQ in Southfield, Michigan. He worked part-time and some weeks full-time in food preparation and other responsibilities. He did not

mind the travel time from his home in Detroit near 8 Mile and Linwood Street to Southfield. He felt appreciated and needed. Arkin's supervisor Ghasaq "Gino" Misho indicated that Jermaine would be welcome to return to the restaurant in the future after this case ended. In fact, defense investigator Beverly Knox spoke with multiple staff members, and they relayed that when Jermaine did not show up for work or communicate, they worried about his status, and that he was a courteous and good employee. Because his family lacked resources to travel to Arkin's, the defense investigator and counsel assisted with the transfer of Jermaine's last paycheck and tips to the family to help keep them afloat.



Jermaine and his daughter

The village Jermaine disappointed still remain in support of him and write to this Court about his positive qualities. As the older brother "who consistently showed up" for his siblings. Ex. A – Letter from Ashley Ballestero, at 04. As the uncle that is "naturally caring and compassionate"

that made his niece Harmoni Hill "feel safe and valued" with "confidence and peace of mind, especially during difficult times within the family." Ex. A – Letter from Harmoni Hill, at 06. As the friend, and now boyfriend, to La Wanna Thomas, that was of "great help in my life in assisting me run my own business. For example, I have a partial amputation on my right foot, so I'm limited to doing some things. Mr. Cook moves put up things that I can't do by myself. He also helps with motivating me when I feel down and gives my reason to be thankful for all my true blessings." Ex. A – Letter from La Wanna M. Thomas, at 05. She also watched "him help build his neighborhood by helping his aunt and family in the community planting, growing plants and organic vegetables along with teaching classes on being fit by eating plant based foods." *Id.*

They are not the only ones that confirm positive qualities. Executive Director Anne Lynn of We 3 Queens Community Outreach provides direct information about Jermaine's volunteer work with that organization. He donated over 1000 hours over five years to the community farm project. Ex. A – Letter from Anne Lynn, 01-03. She witnessed his growth and is committed to helping him with work after his release. The letter includes photos of Jermaine, the volunteer work, and the farm built.

Upon Jermaine's release, he intends to live with Ms. Thomas or return to live with his sister Ashley. While the sister initially believed he would not return to live with them, as she indicated to Probation, she confirmed to defense counsel that Jermaine is always welcome to return to live with them. She does not want him living in a shelter or lacking housing. That is simply not what they do as family.



Jermaine (back left) with siblings

## II.    A Sentence Sufficient but Not Greater than Necessary.

Jermaine pled guilty to the sole count charged in the Indictment without a Rule 11 plea agreement with the government. Specifically, he pled guilty to possessing ammunition as a prohibited person in violation of 18 U.S.C. § 922(g)(1). By the time of sentencing, he will spend approximately 9 months and 2 days in federal custody for this conduct, separate from the 3 days spent in state custody for this conduct in a dismissed 2024 state case.

This Court "may not presume that the Guidelines range is reasonable" but rather "must make an individualized assessment" of this case. *Gall v.*

*United States*, 552 U.S. 38, 50 (2007). The punishment imposed "should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-488 (2011) (omitting citations). That is because the Sentencing Guidelines have a "real and pervasive effect . . . on sentencing." *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016).

### A. Sentencing Guidelines

*Advisory sentencing guidelines*: The Probation Office scored the base offense level as 20 pursuant to U.S.S.G. § 2K2.1(a)(4)(B). Probation then reduced the offense level by -3 because Jermaine accepted responsibility, thus reducing it to the final offense level of 17.

| Timing | Offense Level | Criminal History Points | Category | Resulting Guideline Range |
|---|---|---|---|---|
| Before January 9, 2026 | 17 | 3 | II | 27 to 33 |
| After January 9, 2026 | 17 | 5 | III | 30 to 37 |

Five points scored to arrive at criminal history category III. Jermaine's efforts to resolve traffic ticket cases resulted in two of the five points, thus the higher criminal history category in this case. Specifically, on January 9, 2026, he resolved an outstanding no operator's permit case out of the 23rd District Court while detained at FDC Milan. That court held a virtual hearing

9

and sentenced him to 93-days custody (time served) for that misdemeanor case.

Counsel provided a physical copy of the initial presentence report (PSR) to Jermaine and reviewed it together in person. After discussing the report, counsel submitted edits and additional information to the report writer, but no legal objections were identified. Jermaine received a final copy of the PSR via postal mail. There are no legal objections or additional corrections to the report.

Counsel submits that a sentence below the advisory sentencing guidelines in this case is appropriate when carefully balancing the § 3553(a) factors. That is, a sentence of no more than sixteen months incarceration with twenty-four months of supervised release to follow.

*The guideline development supports a variance*: The evolution of § 2K2.1 reflects a long pattern of reactive amendments rather than empirically grounded policymaking. Its history tells "a story of repeat, non-evidence-based, one-way ratchets that reflects a systemic failure to adopt a deliberative process that 'begins with, and builds upon, empirical data.'"[1]

---

[1]    *See* Statement of Michael Carter, Federal Public Defender for the Eastern District of Michigan on Behalf of the Federal Public and Community Defenders, Before the United States Sentencing Commission Public Hearing on Firearms Offenses (Mar. 7, 2023), *available at* https://tinyurl.com/94j4ytty.

From inception, the 1987 sentencing guidelines lacked an empirical foundation.[2] As the United States Sentencing Commission itself acknowledged, "substantial [pre-guidelines] sentencing variation" for firearms offenses arose from the wide range of circumstances in which such cases occurred, making it impractical to derive a consistent empirical baseline.[3] Thus, the original firearms guidelines development was not based on the same detailed statistical analyses as some of the other original guidelines.

Over the years, the guidelines continued to eschew empirical focus. They were amended at least ten times to increase penalties, usually in response to legislation or Department of Justice requests rather than data or national experience. Thus, the current version of § 2K2.1 does not reflect a deliberative process "that begins with, and builds upon, empirical data."[4]

The original § 2K2.1, which covered receipt, possession, or transportation of firearms by prohibited persons and a related false

---

[2]    *See* U.S.S.C., Supplementary Report on the Initial Sentencing Guidelines and Policy Statements at 18 (1987) ("[S]tatistical analyses usually provided the starting point for the guidelines that were adopted, [but] in some instances these analyses were of little value in explaining or rationalizing current sentences. Firearms violations provide a notable example.").

[3]    U.S.S.G. §2K2.1, cmt. background. (1987).

[4]    *See* U.S.S.G. ch. 1, pt. A, at 5.

statement offense (18 U.S.C. §§ 922(a)(6), (g), (h)), set a base offense level of 9 for prohibited persons possessing firearms, along with just two specific offense characteristics: (1) a one-level increase if the firearm was stolen or had an altered serial number and (2) a four-level decrease if the firearm was for sporting or recreational purposes.[5] There was a cross-reference for the use of the charged firearm in another offense.[6]

Two years later in 1989, the Commission increased penalties without conducting a full empirical assessment of the thousands of earlier cases. It did several acts:

- consolidated the three guidelines into § 2K2.1 (unlawful possession) and § 2K2.2 (trafficking)[7];
- raised the standard § 2K2.1 base offense level from 9 to 12 for prohibited persons under § 922(g);
- raised the base offense level for offenses involving National Firearms Act (NFA) weapons or machine guns (§ 922(o)) from 12 to 16 in both § 2K2.1 and § 2K2.2)[8]; and
- further raised specific offense characteristics under § 2K2.2(b)(1)

---

[5]     *See* U.S.S.G. §2K2.1 (Nov. 1, 1987). The Commission determined from pre-guidelines sentencing practices that "[a]part from . . . criminal history, [a person's] actual or intended use of the firearm [was] probably the most important factor in determining the sentence." *Id.*, cmt. background. (1987). Thus, it provided the four-level reduction if the firearm was possessed for recreational purposes.

[6]     *Id.*

[7]     *See* U.S.S.G., App. C, Amend. 189 (Nov. 1, 1989).

[8]     *See id*. §§ 2K2.1(a)(1), 2K2.2(a)(1) (1989).

12

and § 2K2.2(b)(2), and removed the scienter requirement from the 1987 § 2K2.3(b)(2)(C) enhancements without explanation.[9] These changes marked the beginning of a series of upward changes that were justified primarily by policy concerns or external pressures rather than data.

A year later in 1990, Amendment 333 raised the base offense level for possession and receipt without citing supporting analysis. The Commission justified the increase based only on the perfunctory statement that the increase was "to better reflect the seriousness of the conduct covered."[10]

The Commission's reasoning was concerning in light of the Sentencing Reform Act of 1984's directives to the Sentencing Commission. There, Congress required the Commission to "insure that the guidelines reflect the fact that, in many cases, current sentences do not accurately reflect the seriousness of the offense" and to do so by "review[ing] and revis[ing], in consideration of comments and data coming to its attention, the guidelines

---

[9]     *See* App. C., Amend. 189 (Reason for Amendment) (1989).

[10]     *See* U.S.S.G., App. C, Amend. 333 (Nov. 1, 1990). That year, groups like the National Association of Criminal Defense Lawyers (NACDL) and the American Bar Association (ABA) criticized the Commission for abandoning its "extensive empirical research in monitoring sentencing trends." Statement of Benson Weintraub, National Association of Criminal Defense Lawyers, Before the United States Sentencing Commission, at 2 (Mar. 15, 1990); *see also* Statement of Samuel J. Buffone, Chairperson, U.S. Sentencing Commission Committee Criminal Justice Section, at 5-6 (Mar. 15, 1990)

promulgated pursuant to the provisions of this section."[11] Here, the Commission further elevated the base offense levels without providing the empirical support required of it by the Act.

The most significant structural changes occurred in 1991 with Amendment 374. The Commission restructured the guidelines by consolidating them into a single provision, § 2K2.1, and again increased the penalties for all firearms offenses.[12] These changes were prompted by an examination of the firearms guidelines by the Commission's Firearms and Explosive Materials Working Group.[13]

The Working Group claimed to examine "monitoring data, case files, and appellate decisions, and received comments from the field and from the Bureau of Alcohol, Tobacco, and Firearms" using the 1987/1988, 1989, and 1990 guidelines.[14] But, it reviewed § 2K2.1 sentences in just 64 cases from 1989 alone, when the heightened base offense level applied, because the large number of cases (up to 1,500) applying the earlier version of § 2K2.1 ostensibly "prevented the working group from conducting any meaningful

---

[11]     28 U.S.C. §§ 994 (m) and (o).
[12]     *See* U.S.S.G. §2K2.1 (Nov. 1, 1991).
[13]     *See* U.S.S.C., Firearms and Explosive Materials Working Group Report (Dec. 11, 1990) (1990 Working Group), *available at* https://perma.cc/2KFN-MGVJ.
[14]     *Id.* at 1.

and complete review of [those] cases[.]"[15]

Despite the narrow empirical sample, the Working Group recommended substantial base offense level increases tied to prior convictions. That recommendation occurred notwithstanding its finding that sentence length was *not* strongly correlated with the existence of prior firearms or drug-related offenses or convictions for crimes of violence. Factors such as use of a firearm in connection with other criminal activity or self-defense were more influential in actual sentencing decisions.[16]

The Working Group's recommendations were predicated upon other factors unrelated to empirical research and the statutory purposes of sentencing. For instance, an explanation for recommending these increases was the "need for improved proportionality" between people sentenced under the firearms guidelines, and those sentenced under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e).[17] The working group also noted the purported reluctance of federal prosecutors to expend resources on firearms offenses "in light of the relatively low penalties under the guidelines."[18]

Despite calls for empirically based reforms from Defenders and the

---

[15]    *Id.* at 8-9 & nn. 29-30.

[16]    *Id.* at 10, 18-19; *see also id.* App. D. at 8, 10-11.

[17]    *See id.* at 19-20.

[18]    *See id.* at 32

American Bar Association,[19] the Commission amended § 2K2.1 to provide that a person with two prior felony convictions of either a crime of violence or a controlled substance offense received a base offense level of 24 (enhanced to 26 if the offense involved a NFA firearm).[20] A person with one qualifying prior received a base offense level of 20 (enhanced to 22 if the offense involved a NFA firearm).[21] If the offense involved a NFA firearm, the individual was subject to a base offense level of 20, even without a qualifying prior, if he was a prohibited person.[22] Even without a qualifying prior, the standard base offense level for a prohibited person was increased from 12 to 14.[23]

The cumulative effect of these changes was to transform § 2K2.1 from a simple guideline focused on the actual or intended use of the firearm into a complex framework. A framework dominated by criminal history and a growing list of specific offense characteristics. For example, under the 1987 version, enhancements were limited to a single level for a stolen firearm or

---

[19]    *See* Statement of Barry J. Portman on Behalf of Federal Public and Community Defenders Before the U.S. Sentencing Comm'n, Washington, D.C. (Mar. 5, 1991); Statement of Paul D. Borman on Behalf of the American Bar Ass'n Before the U.S. Sentencing Comm'n, Washington, D.C., at 13.

[20]    *See* U.S.S.G. §2K2.1(a)(1), (a)(2) (1991).

[21]    *See id.* §2K2.1(a)(3), (a)(4)(A).

[22]    *See id.* §2K2.1(a)(4)(B).

[23]    *See id.* § 2K2.1(a)(6).

altered serial number. The modern guideline incorporates numerous enhancements based on the number of firearms, straw purchasing, international transport, altered serial numbers, and possession in connection with another felony – features that significantly elevate sentencing ranges compared with the original structure.

| | 1987 Version | Current Version |
|---|---|---|
| Base Offense Level | Uniform base offense level of 9 for possession, transportation, or receipt of firearms by prohibited persons. | Alternative base offense levels based on prior convictions and firearm characteristics, with a minimum base offense level of 14 for felon-in- possession cases without other enhancements and heightened base offense levels ranging from 18 to 26. |
| Specific Offense Characteristics | Limited special offense characteristics: The only enhancement was a one-level increase if the firearm was stolen or had an altered/obliterated serial number | Multiple special offense characteristics with subparts, based on offense specifics: e.g., enhancements for the number of firearms, straw purchasing, leaving the U.S., and firearm possession in connection with another felony offense |
| Policy Considerations | Emphasized actual or intended use of the firearm as among the most important factors in determining the sentence. | Greater focus on offense characteristics and speculative potential for harm, reducing emphasis on intent. |
| Key Takeaway | A more straightforward framework with fewer adjustments, emphasizing individual circumstances and intended use. | An expanded framework with detailed special offense characteristics and baes offense level adjustments, greater emphasis on criminal history, leading to harsher and more complex sentences. |

This trajectory reflects a consistent pattern: repeated increases in

17

penalty severity divorced from an empirical tie to sentencing outcomes or public-safety effects. Thereby marrying increases to responses to legislative directives, prosecutorial concerns, or policy judgments. Throughout these amendments, the Commission did not undertake a data-driven assessment of whether the evolving structure of § 2K2.1 advanced the statutory purposes of sentencing. Instead, the guideline grew increasingly complex and punitive, relying heavily on prior convictions as a proxy for culpability. That proxy took greater hold even though Chapter Four already accounts for criminal history separately.

The practical effect is that defendants like Jermaine face punishment that are longer in prison for the same conduct that would have warranted just months under the original guidelines. Here is how it applies to Jermaine's circumstances:

|  | 1987 Version | Current Version |
| --- | --- | --- |
| Base Offense Level | 9 | 20, based on firearm having the capability to accept a large capacity magazine. |
| Specific Offense Characteristics | 0 | 0 |
| Acceptance of Responsibility | -2 | -3 |
| Guideline Range | In combination with CHC III, a guideline range of **4-10 months** | In combination with CHC III, a guideline range of **30-37 months.** |

18

This is a substantial disparity. One that did not develop through the Commission's traditional, empirically based process for the continued refinement of § 2K2.1. Instead, through a series of reactive adjustments often divorced from data, sentencing practice, or demonstrated public-safety benefit. In short, current § 2K2.1 guidelines bear little resemblance to the original framework and impose significantly higher ranges for conduct that previously warranted far lower penalties.

For all these reasons, a downward variance is further supported in this case for a sentence that is "sufficient, but not greater than necessary."

### B. Other Factors for Consideration

*General and specific deterrence*: The community generally supports sentences lower than the firearm guidelines.[24] Real jurors, aware of the facts of real cases, believe the low end of the range is "almost three times higher" than necessary.[25] Research also consistently shows that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[26] The Department of Justice too recognizes that "[t]he certainty of being

---

[24]  Hon. James S. Gwin, *Juror Sentiment on Just Punishment,* 4 Harv. L. & Pol'y Rev. 173, 182 (2010).

[25]  *Id.* at 187-88.

[26]  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

caught is a vastly more powerful deterrent than the punishment."[27]

It is unclear how an arrest and someone's prosecution for a case of possessing ammunition or a gun will have general deterrence to the public. Here, Jermaine's family, friends, and community members now understand the "why" of the arrest. They, like him, are surprised given that they all believed the matter resolved when the State of Michigan dismissed the case in July 2024. Now, they understand that he is with the "feds," the potential statutory maximum sentence is up to fifteen years, even if the advisory sentencing guidelines suggest a much lower sentence, and that he is missing from their daily lives.

The more pressing goal is specific deterrence upon Jermaine. After his conviction in 2004 for a state felony case and eventual discharge from parole in 2014, there were no other convictions or arrests. *See*, *e.g.*, PSR § 34-36. More importantly, it is the effect of the actions on him beyond losing his liberty that adds to deterrence:

> I know that the moment that I allowed my decisions to become criminal was the same moment I lost sight of all the personal things, people, and relationships I jeopardized. Just to have reality reflect upon me like a mirror, exposing where I went wrong. But the positive thing about this situation is that mistakes

---

[27]    NAT'L INSTITUTE OF JUSTICE, *Five Things About Deterrence* (Jun. 5, 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last accessed January 1, 2025).

are made to learn from in order to grow into knowledge of understanding.

Ex. B – Letter from Jermaine Ray Cook, at 01. Jermaine also understands that this conviction and sentence means that he is now part of the many under federal government oversight.

*Protecting the community*: Jermaine's pretrial custody protected the community during the approximate nine months and a term of incarceration, even with a variance, will further protect it. During a period of incarceration and the term of supervised release of two years, the community will be protected further, and his decision-making will be scrutinized.

During his time in custody, Jermaine reflected on his actions:

> I've been depending on patience for twenty-two years, letting my thoughts become clouded by not using the mental tools I usually stick with. The Five P's, Pre, Preparation, Prevent, Poor, Performance in life and everyday decision-making. I took an underdeveloped gamble, which was a bad move. A decision that comes with a penalty for my offense. The time in custody at the jail and now at Milan has let me think more about how I got here and what will need to be different.

Ex. B – Letter from Jermaine Ray Cook, at 01.

To aid in protecting the community, Jermaine does believe that trauma-focused Cognitive Behavior Treatment will assist in addressing untreated trauma from his childhood and teenage years, much of it to assist when he feels helpless.

*Programming needs*: During the last few years, the BOP suffered

21

massive budgetary reductions and staffing losses. All directly affecting prisoner programming, healthcare, and rehabilitation efforts. This was the result of budgetary cuts across the federal government. It has not recovered.[28] Counsel submits that the core question is not the treatment needs in the BOP but what will occur beyond the prison walls that is critical. Long-term development and rehabilitation, in other words.

Jermaine is committed to completing the Non-Residential Drug Abuse Treatment Program administered by psychology staff.[29] This is in combination with the Seeking Safety and Seeking Strength program, also administered by psychology staff, which is a

> present-focused, evidence-based approach to treat trauma symptoms and substance use concurrently. It is based on the premise that healing from each disorder requires attention to both disorders. This intervention teaches individuals to manage and decrease symptoms and gain control over both disorders by

---

[28]    Water Pavlo, *The Federal Bureau of Prisons: A Case Study in Repeated Failure*, Washington Post (Jan. 26, 2026), https://www.forbes.com/sites/walterpavlo/2026/01/26/the-federal-bureau-of-prisons-a-case-study-in-repeated-failure; Beth Schwartzappel, *Amid 'Catastrophic' Shortage, Psychologists Flee Federal Prisons in Droves*, The Marhsall Project (Jan. 26, 2026), https://www.themarshallproject.org/2026/01/26/mental-health-federal-prisons-staffing-shortages; *House Members Raise Alarm about Bureau of Prisons Understaffing*, FEDweek (Mar. 4, 2026), https://www.fedweek.com/federal-managers-daily-report/house-members-raise-alarm-about-bureau-of-prisons-understaffing.

[29]    Federal Bureau of Prisons, FIRST STEP ACT APPROVED PROGRAMS GUIDE 23 (March 2026), *available at* https://perma.cc/Q499-WJCJ.

addressing current life problems.[30] What he will need is employment assistance once released. Obtaining employment was extremely difficult and lack of money and employment drove the offense conduct in this case. He cannot stress enough the need for help in that area once in the community.

### III.  Jermaine's Facility Recommendation Request

Jermaine requests a designation recommendation to FCI Milan. This will allow his family to visit when they can afford the transportation costs. He is well aware that the BOP makes all final security and facility designations.

### Conclusion

Counsel requests that this Court consider Jermaine's introspection and potential to realign himself in the community by sentencing him to a term of no more than sixteen months in prison.

Submitted,

s/ Fabián Rentería Franco
Fabián Rentería Franco
Counsel for Jermaine Ray Cook
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, MI 48226
T: (313) 463-6143

Dated: April 30, 2026          E: Fabian_Renteria_Franco@fd.org

---

[30]     *Id.* at 24.

**Certificate of Service**

I certify that on April 30, 2026, the following documents

- Jermaine Ray Cook's Sentencing Memorandum
- Exhibits to Sentencing Memorandum

were filed with the Clerk of the Court using the CM/ECF system, which

should send notification to opposing counsel.

s/ Fabián Rentería Franco
Fabián Rentería Franco